## CROWE v. TRICKEY.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF ARIZONA.

No. 71.   Submitted October 31, 1906.—Decided January 21, 1907.

The statement of facts which the Supreme Court of a Territory is called on to make is in the nature of a special verdict, and the jurisdiction of this court is limited to the consideration of exceptions and to determining whether the findings of fact support the judgment.

The statement of facts should present clearly and precisely the ultimate facts, but an objection that it does not comply with the rule because it is confused and gives unnecessary details will not be sustained if a sufficient statement emerges therefrom.

Where the Supreme Court of a Territory proceeds on the bill of exceptions before it as containing all the evidence in the case below, and the record in this court shows that all the evidence was contained in the bill of exceptions, that is sufficient, even though the bill of exceptions may have failed to state that it contained all the evidence given in the case.

A broker is not entitled to commissions unless he actually completes the sale by finding a purchaser ready and willing to complete the purchase on the terms agreed on; his authority to sell on commission terminates on the death of his principal and is not a power coupled with an interest; and, in the absence of bad faith, he is not entitled to commissions on a sale made by his principal's administrator, without any services rendered by him, even though negotiations conducted by him with the purchaser, prior to owner's death, may have contributed to the accomplishment of the sale.

71 Pac. Rep. 965, affirmed.

THIS was an action brought by Crowe in the District Court of Santa Cruz County, Arizona, against Trickey, administrator of the estate of N. H. Chapin, deceased, to recover the sum of five thousand dollars as commission on a sale alleged to have been effected by Crowe for Chapin, during his life, of a one-fourth interest in a mine. The case was tried by the District Court without a jury, a jury having been waived by agreement of the parties, and that court made findings of fact and stated conclusions of law therefrom, upon which it rendered judgment in Crowe's favor, January 10, 1902, to be paid in due course of administration. From that judgment the case was carried by appeal to the Supreme Court of the Territory of Arizona, which, March 20, 1903, reversed the judgment, and remanded the case to the District Court, with directions to render judgment for defendant. 71 Pac. Rep. 965.

The record states:

"In the above entitled action the Supreme Court finds the facts to be as follows:

"I. Previous to March, 1899, a mine known as the Pride of the West Mine was owned by three parties. A man named Olsen owned one-half thereof, and Norman H. Chapin, the defendant's intestate, and Jerry Neville each owned one-fourth interest therein.

"In March, 1899, the plaintiff Crowe brought this mine to the attention of one Emerson Gee and his associate A. R. Wilfley. Subsequently, in the latter part of March, 1899, Wilfley purchased Olsen's one-half interest, and made an agreement with Chapin and Neville, in pursuance whereof a deed to the remaining one-half interest was executed by Chapin and Neville, and placed in escrow, the terms of the escrow agreement providing that the deed was to be delivered to Wilfley upon the payment by him of the sum of $100,000 in cash, on or before the 1st day of April, 1900.

"II. It was verbally agreed between Crowe on the one part, and Chapin on the other, representing himself and Neville, that Crowe was to receive ten per cent of the purchase money

.received by them for their interest in the mine, as commission for making the sale. Such deed and escrow agreement were executed by Chapin and Neville on the 1st day of April, 1899.

"III. Prior to the 1st day of April, 1900, Chapin and Neville both died.

"M. M. Trickey was appointed administrator of Chapin's estate and one Henry H. Harmon was appointed administrator of Jerry Neville's estate.

"Wilfley failed to pay the money and take the property under his option, and after the 1st day of April, 1900, at the expiration of the time mentioned in the escrow agreement, and in accordance with the terms thereof, the deed in escrow was returned to Trickey, the administrator of Chapin's estate.

"IV. Thereafter, and on the 7th day of April, 1900, upon the payment of $1,000 by Wilfley, the administrators of these two estates made another agreement with Wilfley, by the terms of which they agreed to execute a deed to a one-half interest owned by the two estates, upon the payment of the purchase price of $100,000, in specific amounts, on different dates therein expressed. This option also lapsed.

"V. After said lapse, and on the 19th day of June, 1900, M. M. Trickey, as administrator of the estate of Chapin, entered into another agreement, which was offered in evidence by the plaintiff, and appears in the bill of exceptions as 'Exhibit 3.'

"By this agreement, Trickey as administrator, gave to Wilfley an option to purchase the one-fourth interest in the mine owned by the estate of Chapin, and obligated himself to execute to Wilfley a deed for such interest upon the payment of $5,000 in cash, $5,000 within three months; the further sum of $5,000 within six months; the further sum of $5,000 within nine months; the further sum of $5,000 within twelve months; and the further sum of $25,000 within eighteen months.

"The plaintiff Crowe had nothing whatever to do with either of the last mentioned options, or with the sale of the property after the death of Chapin.

"VI. In pursuance to this option, Wilfley paid to Trickey the sum of $5,000 in cash on the 19th day of June, 1900; and the following sums on the following dates, respectively: $5,000 on September 19, 1900; $5,000 on December 19, 1900; $5,000 on March 20, 1901; $5,000 on June 17, 1901; $25,000 on December 7, 1901.

"VII. The above mentioned agreement (Exhibit 3) was only an option to purchase, and under it there was no obligation on the part of Wilfley to pay any portion of the purchase price, and no obligation on the part of Trickey to deliver the deed mentioned in the agreement until the last payment of $25,000 in December, 1901, had been made.

"VIII. On the 10th day of December, 1900, Crowe presented to Trickey, as administrator of Chapin's estate, in accordance with the law of the Territory of Arizona, his claim against the estate of Chapin for 'Ten per cent of the purchase price of the Pride of the West Mine, agreement for the sale of which was entered into about April 1st, 1899, and which said agreement of sale was made by Chapin and Neville to A. R. Wilfley, and which sale was brought about by the said George W. Crowe, upon the agreement that he was to receive ten per cent commission upon said purchase-price from said Chapin and Neville, one-half of said ten per cent being $5,000.'

"IX. This claim was rejected by the administrator, and he thereupon brought this action in the District Court of Santa Cruz County on the 25th day of January, 1901, at which time the estate of N. H. Chapin, deceased, was solvent, and amply able to pay all debts of the said estate, and the said Chapin nor the said Trickey nor any one else had paid to the plaintiff the said sum of $5,000, or any part thereof, or anything on account thereof.

"The case was tried before the court, without a jury, a jury having been by agreement of parties waived, and the court made the following findings of fact:

[Here follow findings of fact and conclusions of law by the District Court, upon which judgment was rendered in favor

of the plaintiff, and an appeal prayed therefrom to the Supreme Court as stated.]

"The only statements of fact in the record were contained in the foregoing findings of fact, and in a bill. of exceptions. The said bill of exceptions, which was transmitted to the Supreme Court of Arizona with the record in this case, did not state that it contained all of the evidence which was introduced upon the trial of the case in the District Court, nor upon the points presented to the Arizona Supreme Court for its decision, nor does it otherwise appear from the record in the case that all of the evidence which was introduced upon the trial of the case in the District Court was before the said Supreme Court of Arizona. The abstract of the transcript which contained the evidence stated that 'the defendant by his bill of exceptions, which contained all the evidence taken on said trial, and which is as follows:' then follows the bill of exceptions reciting the testimony of the different witnesses, covering some 23 pages, and at the conclusion thereof the following allowance:

"'The foregoing bill of exceptions was presented to me for allowance on the 24th day of January, 1902, and was by me on the same date submitted to Messrs Hereford & Hazzard, attorneys for the opposite party, who made no objection thereto, whereupon the said bill of exceptions is now by me signed, approved and allowed as of the said 24th day of January, 1902. Geo. R. Davis, Judge,' but the record contains no certificate from the clerk or court that the evidence contained in the bill of exceptions constituted all of the evidence taken on the trial in the lower court, and that fact is controverted by the counsel for the appellee.

"The Arizona Supreme Court found the following facts:

"I. That the efforts of the plaintiff Crowe resulted in procuring the purchaser Wilfley not to purchase absolutely, but to take an option on the purchase of the property involved, for one hundred thousand dollars; that Crowe's principals accepted a deed to the property and placed it in escrow; that although Chapin died before the expiration of that escrow agreement,

the deed executed by him remained subject to the order of the purchaser, and that if he had availed himself of the terms of that agreement, the sale would have been completed and plaintiff. Crowe would have been entitled to his commission, but that Wilfley failed to make the payment and take up the deed, and, after the expiration of the option and after Chapin's death, the deed was returned to the administrator of Chapin's estate and the transaction was closed without any sale being made.

"II. That the sale of the property that was subsequently effected was the result of the negotiations between Trickey, the administrator of Chapin's estate, and Wilfley; that before the date of the sale, Crowe's power or authority to act in the matter had been terminated, and his agency revoked by the death of Chapin.

"III. That in regard to the latter negotiations, Crowe rendered no services to Trickey, received no appointment or agreement from Trickey in reference to the matter, and took no part whatever in the ultimate sale.

"IV. That the plaintiff Crowe did not, between the 8th day of February, 1898, and the 11th day of January, 1900, bring about a sale of Chapin's interest in the property in controversy.

"V. The said A. R. Wilfley paid to the said defendant the sum of fifty thousand dollars, as follows; April 7, 1900, five hundred dollars; June 19, 1900, four thousand five hundred dollars; September 19, 1900, five thousand dollars; December 19, 1900, five thousand dollars; March 20, 1901, five thousand dollars; June 17, 1901, five thousand dollars; December 7, 1901, twenty-five thousand dollars, not for the right, title and interest of the said Norman H. Chapin but for the 'right, title and interest of the said estate of Norman H. Chapin, deceased, in and to' the said property, in compliance with the terms of the contract of sale and title bond executed to the said Wilfley by Trickey, the administrator of said estate."

[Here follow conclusions of law and judgment.]

*Mr. W. C. Keegin, Mr. F. H. Hereford* and *Mr. S. E. Hazzard,*
for appellant:

The finding of the Supreme Court of Arizona is conclusive
of the fact that none of the evidence given at the trial of the
case in the District Court was preserved and carried to the
Supreme Court of Arizona, except that contained in the bill
of exceptions. The finding of the Supreme Court of Arizona
is also conclusive of the fact that this bill of exceptions did not
state that it contained all the evidence which was introduced
upon the trial of the case in the District Court, nor upon the
points presented to the Supreme Court of Arizona for its de-
cision. The finding of the Supreme Court of Arizona is also
conclusive of the fact that it does not "otherwise appear from
the record in the case that all of the evidence which was intro-
duced upon the trial of the case in the District Court was
before the said Supreme Court of Arizona."

The Supreme Court of Arizona erred in reviewing the case
upon the evidence and reversing the judgment in the absence
of a showing that all of the evidence in the case was before it.
*United States* v. *Copper Queen Consolidated Mining Co.,* 185
U. S. 495; *Russell* v. *Ely,* 2 Black, 575; *Gardner* v. *Babcock,*
3 Wall. 240; *Texas Pacific R. Co.* v. *Cox,* 145 U. S. 593;
*Territory* v. *Flores,* 3 Arizona, 215, 77 Pac. Rep. 491; *Paul* v.
*Cullom,* 2 Arizona, 16; *Territory* v. *Clanton,* 3 Arizona, 1, 20 Pac.
Rep. 94; *Score* v. *Griffin,* 80 Pac. Rep. 331; 2 Ency. Pleading &
Practice, 441.

*Mr. Eugene S. Ives* for appellees.

MR. CHIEF JUSTICE FULLER, after making the foregoing
statement, delivered the opinion of the court.

The Supreme Court of the Territory was called upon to
make a statement of the facts of the case in the nature of a
special verdict, and also the rulings of the court in the ad-
mission or rejection of evidence when excepted to. Our

jurisdiction is limited to the consideration of such exceptions and to determining whether the findings of fact support the judgment. *Harrison* v. *Perea*, 168 U. S. 311; *Young* v. *Amy*, 171 U. S. 179.

The statement of facts required by the statute should present clearly and precisely the ultimate facts. And while it may be objected to the statement in this case that it does not properly comply with that rule, for it is quite confused and gives a mass of unnecessary details, yet we think the imperfections in that regard should not be held fatal as a sufficient statement finally emerges. This will be understood by reference to the statement itself, which we have set forth for that purpose.

The bill of exceptions contains some minor rulings on questions propounded to witnesses, but the exceptions thereto were not insisted upon in the Supreme Court nor considered by that tribunal, so that the question before us is whether the findings of fact support the judgment.

But several of the errors assigned are to the effect that the Supreme Court erred in considering or determining the case upon questions of fact, because the bill of exceptions failed to state that it contained all of the evidence given in the case, and the record failed "to show that the bill of exceptions contains all of the evidence given in the case, or all of the evidence bearing upon the questions involved in the decision" of the court.

The Supreme Court proceeded upon the record as containing all the evidence and we are not inclined to hold that the contention that it should not have done so is open to our consideration under the limitations of the statute. But, be that as it may, we think the records show that all the evidence was contained in the bill of exceptions and that that is sufficient even though the bill itself did not so state in express terms. *Gunnison County Commissioners* v. *Rollins*, 173 U. S. 255.

Paragraphs 1485 and 1582 of the Revised Statutes of Arizona 1901 (pp. 461, 474), provide:

"Every paper filed in a case shall constitute a part of the record of the case, including depositions and all written evidence and exhibits offered or admitted in evidence; and no papers thus filed or admitted in evidence, or offered in evidence and rejected by the court, need be incorporated in a statement of facts in order to make it a part of the record."

"On taking an appeal . . . the appellant . . . shall cause to be filed in the Supreme Court . . . the original record of the case, together with a copy of all minute entries made in the case, the same to be certified to by the clerk of the District Court, with the seal of the court affixed, that it contains a true copy of all minute entries made in the case, and that the papers thereunto attached are all the papers constituting the record of the case. . . .."

The clerk accordingly transmitted to the Supreme Court all of the original records and copies of the minute entries. The case, coming on for hearing, the minute entries state:

"The trial then proceeded upon the pleadings herein, in the presence of and before the court sitting without a jury, a jury having been expressly waived in open court by both parties hereto, and the plaintiff to maintain upon his part the issues herein, introduced certain documentary evidence, and also called as a witness the following named person, to wit, George W. Crowe, the plaintiff, who was duly sworn, examined and cross-examined, and thereupon the plaintiff rested his case. The defendant then, to maintain upon his part the issues herein, called as a witness the following named person, to wit, M. M. Trickey, who was duly sworn, examined and cross-examined, and thereupon the defendant rested his case. The evidence being now adduced and the case closed, arguments of the respective counsel followed, and the cause being now fully submitted, the same was by the court taken under advisement."

The evidence of two witnesses, Wilfley and Gee, was taken by deposition, and their depositions were sent up in the transcript. The minute entries show that only two witnesses,

Crowe and Trickey, administrator, were examined before the court, and their testimony is given in narrative form in the bill of exceptions, as well as the testimony of Wilfley and Gee. The minute entries, in speaking of the introduction of "documentary evidence," were manifestly intended to embrace depositions in that term. There is no room for presuming that any evidence was omitted, and the points to which the evidence adduced was addressed preclude such a suggestion.

We are brought then to the question of the sufficiency of the facts found to support the judgment. The findings may be summarized as follows:

Chapin and Neville each owned one-fourth of the mine, and on April 1, 1899, signed a paper addressed to the Consolidated National Bank of Tuscon, Arizona, which is contained in the bill of exceptions; and, by reference, in the statement of facts, and was couched in these terms:

"GENTLEMEN: The enclosed deed from N. H. Chapin, Marie Chapin, Jerry Neville and Refugia Neville, parties of the first part, to Arthur R. Wilfley, party of the second part, is to be delivered to the said Arthur R. Wilfley upon the payment of the sum of one hundred thousand dollars at or before the expiration of one year from the date hereof.

"And you are further directed that all moneys sent you from time to time by the said Arthur R. Wilfley, with instructions to apply the same to the payment of the aforesaid purchase money, shall be so applied and the same placed to the credit of N. H. Chapin and Jerry Neville.

"Therefore, if the said Arthur R. Wilfley shall pay or cause to be paid the sum of money above mentioned, at or before the time aforesaid, you will then deliver the said deed to the said A. R. Wilfley, his agent or assigns. Otherwise the said deed is to be held subject to the order of the said N. H. Chapin and Jerry Neville.

"Dated Washington, Arizona, April 1st, 1899."

This paper and the deed therein mentioned were deposited in escrow in the bank on that day.

The terms of the transaction had been arranged the latter part of March, and it was verbally agreed that Crowe should receive ten per cent commission on the purchase money received by Chapin and Neville.

Chapin died January 11, 1900, and Trickey was appointed administrator February 8, 1900, and qualified as such. Neville died January 3, 1900, and Harmon was appointed administrator and qualified as such.

Wilfley failed to pay the money and take the property, and after the expiration of the time mentioned in the escrow agreement the deed in escrow was returned to Trickey, admintrator.

On April 7, 1900, the administrators of the two estates made an agreement with Wilfley to execute a deed to the half interest on payment of $100,000, in amounts prescribed. This option also expired. Thereafter, and on the nineteenth of June, 1900, Trickey, as administrator of the estate of Chapin, entered into an agreement with Wilfley to convey to him the right, title and interest of the estate of Chapin in the mining property (described as a quarter interest), on payment of $50,000, in designated amounts, and these payments were subsequently made.

Crowe had nothing whatever to do with either of the last-mentioned options, or with the sale of the property after the death of Chapin.

And the claim he presented to Trickey as administrator of Chapin's estate was for $5,000, being one-half of the commission agreed to be paid to him in March, 1899, on the purchase price which would have been received by Chapin and Neville if the option of April 1, 1899, had been carried out.

In these circumstances we concur in the judgment of the Supreme Court of the Territory.

In *McGavock* v. *Woodlief*, 20 How. 221, it was laid down that in order to be entitled to commission "the broker must complete the sale, that is, he must find a purchaser in a situation and ready and willing to complete the purchase on the terms agreed on." But this rule is inapplicable when the

owner refuses without sufficient reasons, to fulfill the agreement which the agent has made. *Kock* v. *Emmerling*, 22 How. 69. Even though he could not have been compelled to carry out his contract if he had chosen to set up the statute of frauds. *Holden* v. *Starks*, 159 Massachusetts, 503. Or when the agent's authority is revoked in bad faith before the completion of the sale. *Sibbald* v. *Bethlehem Iron Company*, 83 N. Y. 378. In this case the subject was much considered, and Finch, J., in delivering the opinion of the court, said, among other things:

"It is the established rule that a broker is never entitled to commissions for unsuccessful efforts. . . . The broker may devote his time and expend his money with ever so much devotion to the interest of his employer, and yet if he fails, if without effecting an agreement or accomplishing a bargain, he abandons the effort, or his authority is fairly and in good faith terminated, he gains no right to commissions, and in such event it matters not that after his failure and the termination of his agency, what he has done proves of use and benefit to the principal. He may have introduced to each other parties who otherwise would have never met. He may have created impressions which under later and more favorable circumstances naturally lead to, and materially assist in, the consummation of a sale. . . . This, however, must be taken with one important and necessary limitation. If the efforts of the broker are rendered a failure by the fault of the employer; if capriciously he changes his mind after the purchaser, ready and willing and consenting to the prescribed terms, is produced; or if the latter declines to complete the contract because of some defect of title in the ownership of the seller, some unremoved incumbrance, some defect which is the fault of the latter, then the broker does not lose his commissions. . . . One other principle applicable to such a contract as existed in the present case needs to be kept in view. Where no time for the continuance of the contract is fixed, by its terms, either party is at liberty to terminate it at will, subject only to the ordinary requirements of good faith.

Usually the broker is entitled to a fair and reasonable opportunity to perform his obligation, subject of course to the right of the seller to sell independently. But, having been granted him, the right of his principal to terminate his authority is absolute and unrestricted, except only that he may not do it in bad faith, and as a mere device to escape the payment of the broker's commissions. . . .

"If, after the broker has been allowed a reasonable time within which to produce a buyer and effect a sale, he has failed to do so, and the seller in good faith and fairly has terminated the agency and sought other assistance by the aid of which a sale is consummated, it does not give the original broker a right to commissions, because the purchaser is one whom he introduced and the final sale is in some degree aided or helped forward by his previous unsuccessful efforts."

In the present case what Crowe had obtained was not an absolute contract of purchase, but an option on the purchase.

The deaths of Chapin and Neville terminated the authority of Crowe to sell on commission, which was not a power coupled with an interest, that is, an interest in the property on which the power was to operate. *Hunt* v. *Rousmanier,* 8 Wheat. 174; *Walker* v. *Walker,* 125 U. S. 339.

Nevertheless, up to the first of April, 1900, if Wilfley had availed himself of the terms of the escrow agreement, the sale might have been completed and Crowe have been entitled to his commission, but Wilfley did not do so, and the deed held in escrow was returned in accordance with the terms of that agreement.

There is no legal basis for the imputation of bad faith, and it is not pretended that Crowe was employed by Trickey or rendered any service to him in the matter of the sale. The bare fact that what he had done in the former negotiations may have contributed to the accomplishment of the sale by Trickey is not enough to sustain his claim for the commission sued for.

*Judgment affirmed.*