BRONN et al. v. NORTHAMPTON–EASTON & W. TRACTION CO.

(Circuit Court of Appeals, Third Circuit. December 20, 1912.)

No. 1,681.

BROKERS (§ 57*)—EMPLOYMENT—TERMINATION—RIGHT TO COMMISSIONS.

Where plaintiffs were employed by defendant as brokers to negotiate sales of certain of defendant's bonds, but before any sales had been completed, and after the expiration of a reasonable time to effect the same, defendant terminated plaintiffs' employment by notice, plaintiffs were not entitled to recover commissions on a sale of other bonds, subsequently issued by defendant and guaranteed by another corporation, to a firm to which plaintiffs had previously introduced defendant's officers and endeavored unsuccessfully to .make a sale of the original bonds.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 66, 67, 72; Dec. Dig. § 57.*]

In Error to the District Court of the United States for the District of New Jersey; Joseph Cross, Judge.

Action by Cecile M. Bronn and Jeanette V. Bronn, doing business as Bronn & Bronn, against the Northampton-Easton & Washington Traction Company. Judgment for defendant, and plaintiffs bring error. Affirmed.

Linton Satterthwait, of Trenton, N. J., and Robert A. Stotz, of Easton, Pa., for plaintiffs in error.

Edward J. Fox and James W. Fox, both of Easton, Pa., and Smith & Brady, of Phillipsburg, N. J., for defendant in error.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

J. B. McPHERSON, Circuit Judge. This action was brought by a firm of brokers doing business in New York City to recover commissions upon a sale of bonds. The trial judge directed a verdict for the defendant upon the evidence produced by the plaintiffs, and this direction is the only error assigned. The facts are as follows:

The defendant is a traction company whose road lies between two points in northern New Jersey. It took out a charter in 1902 under the name of the Easton & Washington Traction Company—which was changed in October, 1910, to Northampton-Easton & Washington Traction Company—mortgaged its property in July, 1903, and before March, 1909, had issued $375,000 of bonds. Of this amount $285,-000 were pledged with bankers in Philadelphia to secure a loan of $230,000, and certain promoters of the company, who were also among its officials, desired either to pay off the loan or to place it elsewhere upon better terms. They also desired to raise money to go on with the construction, only part of the line having then been built; and, as the mortgage was drawn to secure $1,250,000 of bonds, they were seeking to obtain financial help for the general purposes of the corporation by disposing of some or all of the bonds that were still unissued. In this situation Thomas Hay, acting for the company as we

shall assume, was introduced to the plaintiffs, and on March 23, 1909, made the·following contract with them:

"Misses Bronn & Bronn, New York City—Dear Misses: Complying with the request of Mr. N. Voute, I herewith have the pleasure of stating that in the case I accomplish a sale of the Easton & Washington Traction Co.'s bonds with the party you introduce me to, I will protect you with a commission of 2%.
"Yours truly,                                        Thomas A. H. Hay,
                                          "For Easton & Washington Traction Co.
"Miss Bronn is to introduce us, i. e., myself and associates, to Messrs. P. W. Brooks & Co., of N. Y., and the result, if any, of such introduction, is to be in accordance with the above condition.
"Yours respectfully,                                Thomas A. H.· Hay."

This contract is informal, perhaps somewhat ambiguous, but its meaning is made clear by the subsequent conduct of the parties. The plaintiffs' obligation went further than the mere introduction of Mr. Hay and his associates to Brooks & Co. Both parties understood that they were embarking on a common enterprise, namely, the effort to persuade Brooks & Co. to take some or all of the defendant's bonds; and they understood, also, that if the transaction should not be completed no commission would be earned. The usual course of events followed. The plaintiffs and the promoters, separately or together, had frequent interviews with Brooks & Co.; the situation and the condition of the road were discussed; experts examined the property and reported; and these affairs went on for several months. While they were going on, and while the final decision of Brooks & Co. was uncertain, the plaintiffs and the promoters made two or three efforts to persuade other persons of large means to invest, and additional contracts were made with the plaintiffs to pay commissions in case these efforts should succeed. Nothing came of them, however, and nothing definite came of the negotiations with Brooks & Co. under the foregoing contract. It is true that the effort to interest this firm was continued at intervals during the year 1909, but they would not agree to take the bonds, and there is no evidence to cast doubt on their letter of February 4, 1910, in which they wrote to the plaintiffs as follows:

"Replying to your letter of the 3d inst., we would say that no contract, agreement, nor understanding, oral or written, involving the purchase or sale by this house of any bonds of the Easton & Washington Traction Co. or of the Northampton Traction Co. exists or has existed between this house and the companies in question, or the officials representing such companies.
"We, of course, are entirely unaware as to the sources of any information which you claim, as well· as to the nature of any commission contract which you may have had with other parties. We can merely repeat what has been said before, that not only is there no arrangement between this house and the above companies looking to the handling of their securities·at this time, but none which pertains to the future. Anything which may later develop is as unknown to us as to any one else."

This being the state of the negotiation on February 3d, the plaintiffs wrote to the defendant on that day:.

"We are informed that you have entered into a contract with or through Messrs. P. W. Brooks & Company for the sale of bonds of the Easton & Washington Traction Company and the Northampton Traction Company.

"We are a little surprised at your omitting to advise us in the premises, and beg that you will do so now. We assume, of course, that you are protecting us in our commission, but will be glad to have from you at this time your assurance to that effect.

"We shall expect to hear from you immediately."

## On February 22d the defendant replied as follows:

"I have your favor of the 3d inst. I had always thought that if anybody on earth was really aroused by generous and kindly instinct, and wanted to see me win out, it was you. I have spent a great deal of money going back and forth to visit people to whom you have sent me, and up to date have done absolutely nothing, except now to be requested to pay another bill of $8.40 by Mr. Mallory.

"I understand that you have written to Messrs. P. W. Brooks & Co. a letter, and even if they had been disposed to take up my matter and trade with me, after having declined to do so through you, that your letter would have absolutely scared them off, because they do not care to enter into any legal complications.

"I would be pleased if you send me all papers that either you or any of your clients have in relation to the Easton & Washington enterprise, and we will call it a closed incident.

"Regretting this step, I am," etc.

This ended the plaintiffs' connection with the matter, and it is obvious, we think, that up to this point no commissions had been earned. No bonds had been taken by Brooks & Co., none had been contracted for, and the defendant had exercised its undoubted right to revoke the agreement of the preceding March. Afterwards, however, Mr. Hay and his associates, who were also interested in the Northampton Traction Company, a neighboring corporation owning a line in Pennsylvania, undertook to interest Brooks & Co. in a different and more extensive financial plan by which both these enterprises were to be benefited. It was first proposed that both should join in a mortgage, and should share the money to be derived from the sale of bonds thereunder; but this project was disapproved by the legal advisers of Brooks & Co. and was therefore given up. It was then proposed that the Easton & Washington Company should issue bonds under a new mortgage, and that the Northampton Traction Company should guarantee them; and that plan was agreed upon and was carried through early in 1911. Of these securities Brooks & Co. took $365,700 under a contract that we shall regard as equivalent to a sale, and the present suit is for commissions on this sum.

In our opinion these facts presented no case for a jury, unless there was evidence tending to prove that the bonds finally issued were in substance the bonds contemplated by the contract of March, 1909, or contemplated during the negotiations thereunder, and that the defendant acted in bad faith in canceling the contract in February, 1910. We have examined all the evidence that may bear upon these points, and we believe that no error was committed in directing the verdict. No charge of bad faith is made in the declaration, and none appears to have been made at the trial; the court was not asked to submit that question to the jury, and little, if any, stress is laid upon it in the plaintiffs' brief. Nevertheless we have given it due consideration, as it seems to be fairly raised by the assignment of error; but we discover no evidence that would justify such a finding. The bonds finally

disposed of differed in important respects from the bonds contemplated by the plaintiffs' contract, and unless the plan under which they were finally issued was adopted in order to escape the plaintiffs' commissions, the defendant was fully within its rights in what was done after February, 1910.

It only remains to be said that when the contract was made in March, 1909, the parties did not have the Northampton Traction Company in mind. It is true that in the course of the negotiations the plaintiffs suggested that the interest on the defendant's bonds might be guaranteed by the Pennsylvania company, but apparently the suggestion was not taken seriously; there is no evidence that the Northampton Traction Company was willing to adopt it, or that the defendant was ready to carry it out, or that Brooks & Co. signified their willingness to take the defendant's bonds if the interest should be thus guaranteed. At the most, it was no more than a tentative proposal, such as is often put forward by one party or the other as a possible solution of problems that may be under consideration at the time, and it had no effect on the final decision of Brooks & Co., after February, 1910, to take the bonds under a new mortgage.

We need not undertake the superfluous task of discussing the law on the subject of a broker's commissions. This has been admirably done already in a case that may fairly be called classic, Sibbald v. Bethlehem Iron Co., 83 N. Y. 378, 38 Am. Rep. 441, in which Judge Finch leaves little to be said on the general principles that are now to be applied. We may quote the following passages from his opinion:

"The duty he undertakes, the obligation he assumes as a condition of his right to demand commissions, is to bring the buyer and seller to an agreement. In that all the authorities substantially concur, although expressing the idea with many differences of phrase and illustration. * * *

"It follows, as a necessary deduction from the established rule, that a broker is never entitled to commissions for unsuccessful efforts. The risk of failure is wholly his. The reward comes only with his success. That is the plain contract and contemplation of the parties. The broker may devote his time and labor, and expend his money, with ever so much of devotion to the interests of his employer, and yet if he fails, if without effecting an agreement or accomplishing a bargain he abandons the effort, or his authority is fairly and in good faith terminated, he gains no right to commissions. He loses the labor and effort which was staked upon success. And in such event it matters not that after his failure, and the termination of his agency, what he has done proves of use and benefit to the principal. In a multitude of cases that must necessarily result. He may have introduced to each other parties who otherwise would have never met; he may have created impressions which, under later and more favorable circumstances, naturally lead to and materially assist in the consummation of a sale; he may have planted the very seeds from which others reap the harvest; but all that gives him no claim. It was part of his risk that, failing himself, not successful in fulfilling his obligation, others might be left to some extent to avail themselves of the fruit of his labors. * * *

"This, however, must be taken with one important and necessary limitation. If the efforts of the broker are rendered a failure by the fault of the employer; if capriciously he changes his mind after the purchaser, ready and willing, and consenting to the prescribed terms, is produced; or if the latter declines to complete the contract because of some defect of title in the ownership of the seller, some unremoved incumbrance, some defect which is the fault of the latter, then the broker does not lose his commissions.

And that upon the familiar principle that no one can avail himself of the nonperformance of a condition precedent, who has himself occasioned its nonperformance.   *   *   *

"One other principle applicable to such a contract as existed in the present case needs to be kept in view. Where no time for the continuance of the contract is fixed by its terms, either party is at liberty to terminate it at will, subject only to the ordinary requirements of good faith. Usually the broker is entitled to a fair and reasonable opportunity to perform his obligation, subject, of course, to the right of the seller to sell independently. But that having been granted him, the right of the principal to terminate his authority is absolute and unrestricted, except only that he may not do it in bad faith, and as a mere device to escape the payment of the broker's commissions. Thus, if in the midst of negotiations instituted by the broker, and which were plainly and evidently approaching success, the seller should revoke the authority of the broker, with the view of concluding the bargain without his aid, and avoiding the payment of commissions about to be earned, it might well be said that the due performance of his obligation by the broker was purposely prevented by the principal. But if the latter acts in good faith, not seeking to escape the payment of commissions, but moved fairly by a view of his own interest, he has the absolute right, before a bargain is made, while negotiations remain unsuccessful, before commissions are earned, to revoke the broker's authority, and the latter cannot thereafter claim compensation for a sale made by the principal, even though it be to a customer with whom the broker unsuccessfully negotiated, and even though, to some extent, the seller might justly be said to have availed himself of the fruits of the broker's labor.   *   *   *

"If, after the broker has been allowed a reasonable time within which to produce a buyer and effect a sale, he has failed to do so, and the seller in good faith and fairly has terminated the agency, and sought other assistance by the aid of which a sale is consummated, it does not give the original broker a right to commissions, because the purchaser is one whom he introduced, and the final sale is in some degree aided or helped forward by his previous unsuccessful efforts."

Much of the foregoing quotation was approved by the Supreme Court in Crowe v. Trickey, 204 U. S. 228, 27 Sup. Ct. 275, 51 L. Ed. 454.

The judgment is affirmed.