**WISCONSIN & ARKANSAS LUMBER CO. v. DAY.**

Circuit Court of Appeals, Eighth Circuit.
October 25, 1929.

No. 8528.

Cockrill & Armistead, of Little Rock, Ark., and John L. McClellan, of Malvern, Ark., for appellant.

Frank Pace, of Little Rock, Ark., H. B. Means, of Malvern, Ark., and Buzbee, Pugh & Harrison, of Little Rock, Ark., for appellee.

Before STONE, Circuit Judge, and MUNGER and REEVES, District Judges.

MUNGER, District Judge. The appellee recovered a verdict and judgment against the appellant upon an alleged contract by the appellant to pay to the appellee a reasonable commission if he procured a purchaser for appellant's lands, and an alleged performance of the contract. Upon this appeal the errors assigned relate to the refusal of instructions to the jury asked by the appellant and to an exception to a portion of the instructions given. The appellee claimed that the contract, on which he based his right of action, was made by the agent of appellant. The appellant contends on this appeal: (1) That the court should have directed a verdict for appellant, because the agent had no express nor implied authority to make the alleged contract; (2) that there never was any ratification of it by the appellant; (3) and that the court erred in instructing the jury that the agent had authority, as a matter of law, to make the contract; (4) that the court should have directed a verdict for appellant because the evidence did not show performance of the contract; (5) or should have given en a requested instruction that the jury should ascertain if the agent was the procuring cause of the sale. The refusal of other requested instructions is also assigned as error. The appellant is the Wisconsin & Arkansas Lumber Company, hereafter called lumber company. It is a Wisconsin corporation, but owned about 145,000 acres of timber land in Arkansas, with sawmills and logging railway and the accessories usual to such operations. At the time of the transactions in controversy it had cut the logging timbers from nearly all of this land.

The lumber company had a board of directors, a president, vice president, secretary, and a treasurer. A. B. Cook was the treasurer and also the general manager. He lived in Arkansas, at the seat of the mills, and was in active operation of the plant. The other officers and nearly all of the directors resided in Wisconsin. No regular meetings of the directors appear to have been held, and rarely were any of the officers, other than Cook, in Arkansas. The directors owned or controlled practically all the corporate stock, and they, or some of them, would confer informally on matters brought to their attention, and the president would usually advise Cook of their conclusions. Correspondence was frequent between Cook and the president, and Cook at times would confer personally with the other officers in Wisconsin. The appellee testified, in effect, that he had an express oral contract with the appellant, made by him with Cook as its agent, for a reasonable commission, if appellee should find a purchaser ready and able to purchase its lands, and offered testimony to show that he found such a purchaser to whom the appellant sold its land. Cook de-

nied the making of the contract. There was no express authority shown, authorizing Cook to make the contract in question, either by the articles of incorporation, resolutions of the board of directors, or by any specific instructions given to him. No ratification of a contract to pay appellee a commission was shown. Cook's apparent authority extended to the management and operation of the sawmills and lumbering operations. He had a large amount of stock in the lumber company, had operated the plant in Arkansas for many years, and seems to have acted in all ordinary matters upon his own judgment. The officers and directors had had a number of discussions about the disposal of the cut-over lands. They had reached the conclusion that it was the best policy to sell all of the lands, with a reservation of the uncut timber, the mill sites, and some of the mineral rights. Cook had contracted to sell small tracts of the land to local farmers, usually in tracts of small sizes, from 40 to 320 acres, and this had continued for some years. The president of the lumber company had executed deeds for these tracts so sold. There was no evidence that any agent had been paid a commission, or had been employed in these sales. The lumber company had employed a forester to aid in keeping fires out of the lands and to promote a growth of young timber. The lands were becoming of some value to mills engaged in making paper, because of this growth of young trees. The expense of the reforestation and of current taxes, and the absence of any income from the cut-over lands, impelled the lumber company to seek an early sale of the lands. The officers and directors had informally agreed that a price of $4 per acre for the whole tract would be reasonable.

The appellee was not a real estate broker, but had engaged in several lines of business and was slightly known by Cook. He informed Cook that he had some persons who might consider the purchase of the lands, and Cook gave him a writing as follows:

"August 26, 1925.

"Mr. T. S. Day, City. Dear Sir: Subject to approval of our Board of Directors we offer our cut-over land in Grant County, approximately 17,000 acres, at price of $5.00 per acre and it is understood that we shall reserve half the oil and mineral rights and also railroad right of way and camp site to be used in our logging operations. This offer expires sixty days from this date.

"Yours very truly,

"Wisconsin & Arkansas Lumber Company,

"[Signed]   A. B. Cook, Treasurer."

The appellee solicited a further extension and Cook later gave him a writing as follows:

"December 12, 1925.

"Mr. T. S. Day, 126 Butler Street, Malvern, Ark. Dear Sir: We will not dispose of our land before the 10th of January, 1926. That is, we will give your clients until the 10th of January, 1926, to look over our land and submit a proposition to us.

"As stated to you, we would consider a price of $4.00 an acre for all of our cut-over land, to be passed on and approved by our Board of Directors, would carry oil and mineral rights reservations, right of way, etc., which we discussed with you.

"Yours very truly,

"Wisconsin & Arkansas Lumber Company,

"[Signed]   A. B. Cook,

Treasurer-Gen'l Manager."

The appellee's testimony tended to prove that he found a purchaser, who afterwards dealt with the lumber company directly, and purchased the land at $4.50 per acre, on the terms that the lumber company, by Cook, had offered. Cook, on December 10, 1925, wrote the president of the lumber company a letter, in which he stated as follows (referring to the efforts of appellee):

"There are some people looking at our cut-over land, and I told them that for our entire holdings I would be willing to submit to our directors a price of $5.00 an acre, reserving one-half the oil and mineral rights, excepting on the Hamlen land, on which we could give them all our oil and mineral rights as Hamlen reserved one-half the oil and mineral rights. I do not know that anything will come of this, but I would not be surprised if we get a proposition of $5.00 an acre. In the meantime I would be glad to have you advise what you think about it. I was careful not to commit ourselves."

And the president, on December 14, 1925, in his reply to Cook stated: "Dear Mr. Cook: Your letters of 10th and 12th inst., received, and I note you state that you have some parties looking over our cut-over lands and that you told them that you would be willing to submit a price to our directors of $5.00 an acre (afterwards changed to $4.00 per acre in your letter of the 12th), we to reserve one-half of the oil and mineral rights on all the land except the Hamlen tract.

"I have talked with Mr. Alexander and we would both be willing to sell at this price, and I am quite sure the other directors would agree with us.

"I think the price low for the land, but, at the same time, we would like to clean this up

by the time we get through cutting the timber, and, on the whole, I think it is best to sell it if we can get this price for it.

"Of course, at this price, it should take in all of our lands except the land at the plant, and if we sold now we would, of course, reserve the timber for a period of years that we were sure would enable us to finish cutting."

In January, 1926, a Mr. Hall, who had been employed by the lumber company as a forester, intimated to the president that he might be able to find a purchaser for the lands, and he was authorized by the president to do so, and was promised a commission if he succeeded. Subsequent negotiations with the company which finally purchased the lands were conducted partly by appellee and his agents, and partly by Hall. A number of visits of inspection of the lands were made by officers and agents of the purchaser, and foresters and timber cruisers aided both parties.

■ It would unduly extend this opinion to relate in detail the correspondence between Cook, the lumber company, and the purchaser and the agents, and the conversations between Cook and the agents and inspectors. We think the instruction of the court that Cook had authority, as a matter of law, to make the alleged contract with the appellee was erroneous. As there was no express authority, and no ratification of the contract with knowledge of its provisions (Bennecke v. Insurance Co., 105 U. S. 355, 360, 26 L. Ed. 990), the authority of Cook must be inferred from the course of dealing between himself and the lumber company. No commission agreement had been made on sales of lands before this time, no discussion or correspondence relating to payment of a commission is shown to have occurred between Cook and the officers of the corporation, and Cook's primary and chief occupation was the manufacture of lumber. But Cook had been allowed to contract the sale of small portions of this land; he was the resident officer and agent of the company with whom it was most probable that prospective purchasers' would seek to deal; the conversations with the directors and officers evidently contemplated that approaches of purchasers would be made to Cook; the officers and directors had expressed a willingness to sell and had informally fixed the price and conditions of sale and doubtless would have approved the sale made, if no agreement to pay the alleged commission had been made. The president had agreed to pay a commission to Hall if he found a purchaser for the lands, and no warning was given Cook that no payment of a commission would be made. We think these facts are not such that the only inference to be drawn was that Cook possessed implied authority to make the contract in question. Ordinarily, the question whether an agent has apparent authority to act for his principal is a question for the jury, when the contract is not in writing and authority to employ usual and suitable means to transact the business intrusted to him, may be implied from the express authority vested in him, or from the course of dealing and the nature of the office possessed by the agent. This is but an application of the rule that, even though the facts be undisputed, if different inferences may reasonably be drawn from those facts, the question is for the jury. Turner et al. v. Yates, 16 How. 14, 25, 14 L. Ed. 824; Merchants' Nat. Bank v. State Bank, 10 Wall. 604, 644, 19 L. Ed. 1008; Lamon v. Speer.Hardware Co. (C. C. A.) 198 F. 453, 457; Hartford & N. Y. Transp. Co. v. Plymer (C. C. A.) 120 F. 624, 630; Cincinnati Traction Co. v. Cole (C. C. A.) 258 F. 169, 179; Monarch Electric & Wire Co. v. National Conduit & Cable Co. (C. C. A.) 138 F. 18, 21; Colorado Springs Co. v. American Pub. Co. (C. C. A.) 97 F. 843, 851; 2 Corp. Jur. 962; 14a Corp. Jur. 410; 21 R. C. L. 854, 855.

■■ There was no error in refusing to direct a verdict in favor of the appellant upon the ground that the evidence did not show that appellee was the procuring cause of the sale of the land. The evidence showed that the purchaser was solicited to purchase by appellee, and by others, but that the negotiations which had proceeded with appellee were discontinued for a time, and the purchaser had announced the intention not to purchase. Afterwards the purchaser became interested again, and finally consummated the purchase. Who caused the purchaser to be ready and willing to make the purchase was a question of fact, under the evidence in the case. Complaint is made of the refusal of instructions stating, in effect, that it must be proved that the plaintiff's efforts were the procuring cause of the sale before he was entitled to recover. The contract, according to the plaintiff's pleading and evidence, gave to the plaintiff the right to sell the lands and agreed to pay him the usual commissions. Such a contract with one acting as a broker requires the broker to find a purchaser ready, able, and willing, to buy on the terms proposed by the seller to the broker, unless the owner refuses to sell without sufficient reasons. McGavock v. Woodlief, 20 How. 221, 227, 15 L. Ed. 884;

Crowe v. Trickey, 204 U. S. 228, 238, 239, 27 S. Ct. 275, 51 L. Ed. 454; 9 Corp. Jur. 611.

■ The instructions given by the court allowed the jury to find a verdict for the plaintiff, if the negotiations between appellee and the appellant were continuous, and if the appellee brought a purchaser to the appellant during the life of the contract, to whom a sale was made. These instructions should have stated more explicitly that the appellee must have been the procuring cause of the sale which was made, and the refusal of the tenth instruction to that effect tendered by the appellant was prejudicially erroneous.

■ It was the claim of the appellant, and testimony on its behalf tended to establish the claim, that no oral or other contract was ever made agreeing to pay to the appellee any commission for his services, and that in dealing with him he was recognized only as the representative of the proposed purchaser. The appellant also claimed that the only contracts ever made with him were evidenced by the writings of August 26 and December 12, 1925, which have been set out. The appellant requested an instruction that the writing of December 12, 1925, did not constitute the plaintiff as an agent to sell the defendant's land, and, if that was the only contract made, a verdict should be found for the defendant. It was not error to refuse this instruction, because it ignores the testimony of appellee that an oral contract then existed for the payment of a commission. If that were true, the writing did constitute the appellee an agent for an extended period.

■■ Upon the question of the measure of damages, in case the appellee should recover, the appellant requested an instruction that, if plaintiff was not a real estate broker, his compensation was not assumed to be upon the basis of commissions usually charged by real estate brokers, but he could recover what his services were reasonably worth, and the jury could consider the customary commissions of real estate agents. We think there is no assumption, as a matter of law, that one not a real estate broker is not to be compensated at the usual rate for such services when performed by real estate brokers. It is a question of fact as to the value of such services in each case. Exception was taken to the refusal of other instructions, but in view of the conclusions which have been stated, requiring the reversal of the judgment and the award of a new trial, in which the same questions may not arise, it is unnecessary to discuss them.

Reversed and remanded.