## SCHNERB et al. v. CATERPILLAR TRAC- TOR CO.
### No. 394.

Circuit Court of Appeals, Second Circuit.
July 28, 1930.

Wm. H. Page, of New York City (H. H. Nordlinger, Wm. Harvey Smith, and Samuel H. Hofstadter all of New York City, of counsel), for appellants.

John Thomas Smith, of New York City (Anthony J. Russo and Albert M. Levert, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and MACK, Circuit Judges.

SWAN, Circuit Judge.

This is the third time this litigation has been before this court. In the first appeal a judgment of nonsuit in a prior action was affirmed. 289 F. 1001. Within a year thereafter the present action was begun in the Supreme Court of New York, and removed on diverse citizenship into the District Court. After a trial, judgment was entered dismissing the complaint on the ground that the judgment in the prior action was a bar. This was reversed in 24 F.(2d) 377. A second trial of the present action was then had, resulting in the judgment above described and the present appeal.

The complaint alleges two independent causes of action; the first being referred to as the French cause of action, the second as the English cause of action. Both in the trial court and on this appeal the questions presented as to each cause of action are sep-

arate and unrelated. Consequently they require independent treatment.

## The French Cause of Action.

This is based upon a written agreement in the form of a letter, dated August 14, 1912, signed by the vice president of the defendant, whose corporate name was then Holt Caterpillar Company, and accepted by the plaintiffs. The defendant manufactured caterpillar tractors under patents owned by it, and desired to extend its foreign sales. Schnerb and Wegimont were business men of substance in Antwerp, Belgium, with commercial affiliations in many countries. By the contract they were given "exclusive representation" in the sale of defendant's tractors in defined territory, including France. Defendant was to refer all inquiries from propective customers within this territory to plaintiffs; they were to refer all inquiries from other territory to defendant. Implicitly each party agreed not to sell in the other's territory. While there was no promise to buy or sell a definite number of tractors, we think defendant impliedly agreed to fill plaintiffs' orders if it could. A price "for the present" of the 60 horse power type of tractor was specified, and defendant promised that the prices charged plaintiffs should be in keeping with the prices being charged other agents. Plaintiffs agreed that the prices at which they resold should be those charged by other agents or "as may be mutually agreed" between plaintiffs and defendant. Plaintiffs were also to act for defendant as it might direct in protecting its patents and apparently its other rights. As indicated by subsequent correspondence, it was expected that the plaintiffs would spend money and effort to develop business in tractors within their territory, and in fact they did so, but, prior to the outbreak of the European War in August, 1914, the plaintiffs had purchased only twelve tractors.

■ The defendant's contention that this was not a valid contract cannot prevail. While the letter is vague in many respects, it constitutes, as the court has previously intimated, a contract. 289 F. 1001, 1004. There are mutual considerations, and the terms are definite enough to use as standards in determining performance. Defendant must fill plaintiffs' orders, if the capacity of its plant permits, and prices are not left wholly to the will of either party; defendant's price to plaintiffs must be the same as it charges other "agents", i. e.,

dealers having exclusive territory, and plaintiffs' resale prices must follow those of other "agents." Each party implicitly promises not to invade the territory of the other while the contract continues. We start, therefore, with the premise that the letter of August 14, 1912, evidences a valid contract.

The complaint sets out this contract and charges that defendant violated it by selling in 1915 seventeen tractors and one trailer to Schneider & Co. for use in France, and by selling from 1916 to the termination of the war a very large number of tractors to the French government. For these violations of their "exclusive territory," plaintiffs ask damages of nearly $350,000, which they assert to be the profits to which they were entitled under the contract; that is, the difference between the price at which defendant would have sold to them and the prices paid by Schneider & Co. and the French government. The defendant pleaded, among other defenses, that the contract had been terminated before the sales in question. If this defense was established, a verdict should have been directed for the defendant, and all other questions become immaterial.

■ The 1912 letter recites that it is "to be effective until more definite conclusions are reached," and that the plaintiffs "are to have the exclusive representation pending the conclusion of a regular agency agreement." It fixes no definite term, and says nothing as to termination. Both counsel, however, assume that it could be terminated at will by either party by giving notice, and we have no doubt that defendant was privileged to terminate its obligations at any time by notice, except as to business already in negotiation by the plaintiffs. See Rees v. Pellow, 97 F. 167 (C. C. A. 6); Bronn v. Northampton-E. & W. Traction Co., 200 F. 897 (C. C. A. 3); Crowe v. Trickey, 204 U. S. 228, 27 S. Ct. 275, 51 L. Ed. 454.

■ On October 12, 1914, defendant addressed a letter of revocation to Mr. Schnerb at his Antwerp office. He had already removed to London, and testified that he did not receive the letter until January 17, 1919. On October 14, 1914, defendant learned by a cable from Schnerb that he was in London. Instead of mailing him a copy of its letter of revocation, defendant instructed its representative in England, Mr. Gotshall, to advise Mr. Schnerb of the revocation. Mr. Gotshall testified that he delivered personally to Mr. Schnerb a copy of the letter of October 12th; this Schnerb flatly denied. However unlikely it may seem that Mr. Got-

shall failed to carry out the instructions given him, which his testimony asserts he did carry out, the jury's verdict compels us to accept Schnerb's denial. Schnerb, however, admits that by March 9, 1915, he knew of the Baumgartner letter which stated that his contract was "suspended by mutual agreement." He thereupon wrote to defendant, protesting vigorously that he had never so agreed. In reply he received an apologetic letter, in which defendant did not clearly take any position on the subject of the termination of the contract. Some of the later correspondence (Exhibit 46) seems to indicate that, with respect to business in places outside the war zone, e. g. the Dutch East Indies, Schnerb was still treated on the same basis as under the old contract. However that may be, it is clear from the record that Schnerb's relations to the sales to Schneider & Co. were on a new and different basis.

Negotiations for the Schneider business were opened by a letter written by Schnerb in November, 1914, but nothing was accomplished until two representatives of Schneider & Co. came to England to witness a demonstration of tractors on February 2, 1915. The tractors used were owned by the British military authorities, and Gotshall arranged with the British authorities to permit the demonstration to be made at the Aldershot camp. Schnerb arranged with Schneider & Co. to send its representatives to witness it. Following this demonstration, Gotshall and Schnerb together wrote a letter dated February 3, 1915, quoting prices and specifications and offering Schneider & Co. an exclusive option to supply the war needs of France, the Balkans, and Russia, provided they would purchase two tractors for demonstration and would order a specified number of tractors for each of said countries within thirty days after arrival of the demonstration machines. It is to be noted that Russia and the Balkans were not within the exclusive territory allotted to plaintiffs by their original contract, so that, in so far as the proposal to Schneider & Co. contemplated sales in these countries, Schnerb could not have acted under that contract. It is also to be noted that the proposed sales were to be made directly by the defendant to Schneider & Co. and not to plaintiffs for resale, as contemplated by the original contract. Moreover, when Schnerb reported the proposal to defendant by his letter of February 5, 1915, he wrote:

"If we can come to agreement with this big firm it will mean to you an invaluable asset * * * and at the same time save to you a lot of heavy expenses to the French business."

This statement as to saving defendant expense in securing French business is utterly inconsistent with the idea that the original contract continued in force, for under it such expenses would fall upon plaintiffs. The statement is repeated in Schnerb's letter of April 30, 1915 (Defendant's Exhibit 15). In the light of the foregoing, the situation seems clear. Schnerb, with the assistance of Gotshall, had succeeded in interesting an important prospective French customer on condition that this customer should have a sales monopoly in outside territory as well as in France; Schnerb thought that for such services he should justly receive compensation, not only on French sales, but on all sales to be made to Schneider & Co., and he proposed "that in no case my commission from you on business with the above firm will run less than 10% (ten per cent.)." He submitted the proposal "without prejudice to my rights," which may mean that he would insist upon a quantum meruit if agreement as to commissions was not reached. It could scarcely mean that he would insist upon the plaintiffs' "exclusive rights" to sell in France under the original contract, for that would be inconsistent with the statement that defendant had been saved the expense of securing French business, and would give Schnerb nothing on Russian or Balkan business. But even if this inconsistent meaning be ascribed to the phrase, Schnerb never did so insist while negotiations with Schneider & Co. were on foot. The defendant offered a 5 per cent. commission. To this Schnerb replied on February 17th:

"It is not my custom, as you are aware, to keep business pending while negotiating eventually for my share. At the same time I cannot agree with 5% you submit my commission to be cut down, and considering my efforts in all times and then also prices realized, I trust if you decline to divide the overprices, you will at least return my commission on the tractors with not less than 10%, and I confidently beg to rely on you without needing to go into the matter further."

Numerous other letters and cables were exchanged during the spring of 1915, and the correspondence shows conclusively that Schnerb never supposed himself entitled to the difference between the prices offered Schneider & Co. and defendant's prices to him; he steadily insisted on a commission, protesting only his dissatisfaction with less

than 10 per cent. Defendant's letter of June 3d (Exhibit 40), discusses the whole situation, and, when Schnerb got it, all he wrote in reply was "the commission is inadequate in as much as freight per RR and boxing are not to be figured, and we must reserve our standpoint."

It is perfectly clear that neither Schnerb nor defendant supposed the Schneider business was to be on the basis of the original contract; both understood that it was on a commission basis, and the only dispute was as to the amount of the commission. Had Schnerb sued for the value of his services, he could have recovered a commission on the sale of the two machines ordered by Schneider in February, 1915, and although the option lapsed on July 1, 1915, defendant was apparently willing also to allow him a 5 per cent. commission on its later sales to Schneider & Co. But this suit was on the original contract of 1912. Commissions were not recoverable, and a verdict based on the assumption that the original contract applied to the Schneider business and to the later sales to the French government cannot stand. As to war material for use in France, the correspondence of the parties conclusively shows that they regarded the original contract as at an end and had substituted for it a new arrangement. Accordingly direction of a verdict for defendant on the French cause of action was correct.

### The English Cause of Action.

This claim alleges an oral agreement to pay the reasonable value of plaintiffs' services in bringing about sales by defendant to the British government. The verdict settles that plaintiffs were not the procuring cause of such sales, and, since there is evidence to sustain the verdict, it is conclusive, unless the errors assigned are substantial.

The first assignment challenges the exclusion of conversations Schnerb had with Gotshall on the former's visit to Peoria in October, 1919. Assuming such conversations to have been competent, we cannot hold that their exclusion was reversible error without knowing what was the evidence excluded. The record does not disclose that. It could at most have been an admission, whose substance might have been purely cumulative.

Numerous assignments attack the admission of hearsay. Holden's statement that Lawson had cabled his firm that defendant had available tractors was hearsay, but harmless. The other talks to which objection is made were not hearsay at all. They were not offered to prove the truth of what was said but the fact that such statements were made. They were transactions between defendant and Balfour, Williamson & Co., and were part of the dealings which resulted in the defendant's sales. As such they were competent.

It was clearly discretionary with the trial judge to exclude Exhibit 64 for identification. If it had any significance to the issues, it was of the slightest.

For the reasons stated, no error appears as to either cause of action.

The judgment is affirmed.