R. S. STOKVIS & SONS, Inc., et al. v. KEARNEY & TRECKER CORPORATION.

District Court, S. D. New York.

Aug. 3, 1944.

Cravath, de Gersdorff, Swaine & Wood, of New York City (Albert R. Connelly, George S. Collins, and Harold R. Medina, Jr., all of New York City, of counsel), for plaintiff.

Dwight, Harris, Koegel & Caskey, of New York City (Charles H. Tuttle and Frederick W. R. Pride, both of New York City, and Louis Quarles and Lester Clemons, both of Milwaukee, Wis., of counsel), for defendant.

COXE, District Judge.

This is an action to recover various sums aggregating $1,459,646.35 as damages for alleged breaches of an exclusive sales representation agreement made by the defendant. In 1939 and 1940, a French corporation known as R. S. Stokvis & Fils, S. A., was the exclusive sales representative of the defendant in France. During those years the defendant made large direct sales of milling machines and equipment to the French Government. It is the contention of the plaintiffs that these sales entitled the French corporation to be paid the sums now sought to be recovered, either (1) as agreed percentages of the amounts of the different sales, or (2) as damages for violation of the exclusive sales representation agreement. The claims of the French corporation have been assigned to and are now held by the plaintiff, R. S. Stokvis & Sons, Inc.

The action was tried by the court without a jury.

The plaintiff, N. V. Handelmaatschappij R. S. Stokvis & Zonen (referred to as the Dutch Stokvis Company) is a corporation of the Netherlands, formerly domiciled in Rotterdam, Holland, but now domiciled in Curacao, Dutch West Indies. It is joined as a plaintiff solely because it was a party to the exclusive sales representation agreement with the defendant, and it claims no beneficial interest in any recovery in the action. The plaintiff R. S. Stokvis & Sons, Inc. (referred to as the New York Stokvis Company), is a New York corporation, all of the stock of which is owned by the Dutch Stokvis Company. It sues as the assignee of R. S. Stokvis & Fils, S. A. (referred to as the French Stokvis Company), a French corporation, all of the stock of which, except directors' qualifying shares, is likewise owned by the Dutch Stokvis Company. The defendant, Kearney & Trecker Corporation, is a Wisconsin corporation, engaged in the business of manufacturing and selling milling machinery and equipment at West Allis, Wisconsin.

The complaint contains three separate causes of action, all based on an exclusive sales representation agreement entered into between the Dutch Stokvis Company and the defendant in November, 1923. Copies of the documents constituting this agreement are attached to the complaint. It is alleged that the agreement was entered into by the "Dutch Stokvis Company on behalf of itself and the French and Belgium Stokvis companies for their respective territories." The Belgian Stokvis Company referred to is a wholly owned subsidiary of the French Stokvis Company. The complaint further alleges that after the agreement became effective on January 1, 1924, these different Stokvis companies acted as the defendant's exclusive sales representative for their respective countries, and that as a result of their activities "the name and reputation of the defendant and its products became well

and favorably known in Holland, France and Belgium and their respective colonies".

The first cause of action concerns sales by the defendant of 129 milling machines and equipment covered by contracts Nos. 1218, 483 and 1365 between the defendant and the French Government. It is alleged that in the latter part of 1939 the French Stokvis Company placed orders with the defendant for these machines and equipment, for an aggregate sales price of $810,-135, which included a commission of 15% for the French Stokvis Company, to be sold directly to the French Government; that the defendant accepted such orders and subsequently entered into contracts therefor with the French Government; that the defendant thereby agreed to pay the French Stokvis Company 15% of the sales price, or $121,520.25; and that the defendant has received payment in full for all the machinery and equipment covered by the contracts.

The second cause of action is similar to the first, except that it involves 1415 milling machines, and equipment therefor, having an aggregate sales price of $13,-381,261. It is alleged that the French Stokvis Company consented that the defendant might sell these machines and equipment directly to the French Government, "but only upon condition that the French Stokvis Company receive 10% of the sales price thereof"; and, further, that the defendant by entering into contracts therefor with the French Government (Nos. 240 and 240-A) agreed to pay to the French Stokvis Company 10% of the sales price thereunder, or an aggregate of $1,338,126.10.

The third cause of action is alternative to the first two, and is based on the theory that the defendant breached the exclusive sales representation agreement by itself selling direct to the French Government, and that the French Stokvis Company was damaged thereby in the sum of $1,459,646.35.

The defendant's answer admits the existence of the documents alleged to constitute the 1923 agreement; admits that after January 1, 1924, the Dutch Stokvis Company acted as the defendant's exclusive dealer in Holland, The French Stokvis Company as its exclusive dealer in France, and the Belgian Stokvis Company as its exclusive dealer in Belgium; admits that the name and reputation of the defendant and its products became well

and favorably known in the Netherlands, Belgium, France and certain of its colonies "partly as a result of the activities" of the Stokvis companies; and admits that it made the sales in question to the French Government. In other respects, the answer is in substance a general denial; it also sets up various affirmative defenses which will be dealt with later.

The Dutch Stokvis Company was incorporated in Holland in 1922; the business was an old one, and had first been conducted as a partnership, and later as an English Company; the activities were numerous, and included the purchase and sale of machine tools of foreign origin. The French Stokvis Company was incorporated in France in 1914, and continued the machine tool business there, which had previously been conducted by the Dutch Stokvis Company. In 1939 and 1940, Hugo Stokvis was the Administrateur Delegue of the French Stokvis Company. The Belgium Stokvis Company was incorporated in Belgium in 1919.

The predecessor of the Dutch Stokvis Company commenced dealing in the defendant's products in 1902, and, after the French Stokvis Company was incorporated, that company dealt in such products in France until 1919. From 1919 to 1923, the defendant's products were sold in Holland, Belgium and France through an American concern known as Allied Machinery Company, and in the latter part of 1923 the sales representation agreement, which is the basis of the present action, was entered into between the Dutch Stokvis Company and the defendant. This agreement is in the form of a letter written by the Dutch Stokvis Company to the defendant from New York City, dated November 23, 1923, and a telegram of confirmation from the defendant, dated December 12, 1923, and received by the Dutch Stokvis Company at New York City on the same day. The letter from the Dutch Stokvis Company evidencing the agreement is as follows:

"We hereby beg to confirm in writing the agreement verbally made with your Mr. Kearney with regard to the territory embodied in Holland, Belgium, France and its respective colonies.

"You grant us the exclusive representation for the above mentioned territories beginning January 1, 1924, for an indefinite time, subject to a written notice of six (6) months, with the understanding

that we push the sale of your products in the territories granted to us to the best of our ability, exclusive of any other American make. You to refer to us all inquiries or orders coming from or destined for the territories mentioned above.

"All further trade conditions will be arranged separately.

"We beg you to confirm to us that you are in agreement with the above."

After this agreement was entered into, the different European Stokvis companies bought machine tools from the defendant and resold them to their customers in their respective territories. In addition to the publicity and missionary work in effecting sales, each company performed considerable services in setting up and servicing the machines after delivery to its customers. It was the practice of the defendant to issue price lists periodically, to establish discounts therefrom available to its dealers, and to extend credit on terms which varied from time to time. The defendant had, however, at all times, complete control over the prices at which sales were made, over the discounts allowed, over the terms of payment, and over the times of delivery. The discounts in effect during 1939 and 1940 were as follows. From January 1 to September 6, 1939, 10 plus 15%; from September 6, 1939, to May 22, 1940, 10%; and subsequent to May 22, 1940, 15%.

Hugo Stokvis testified that the French Stokvis Company customarily fixed prices to its customers at "15% or more" above the defendant's list prices, less discount. He estimated roughly the expenses of the company in normal years for selling, setting up and servicing the machines, at about 12% of the selling prices. On the basis of these figures, the profit of the French Stokvis Company in normal years could hardly have exceeded 3% of its selling prices to its customers.

### Contract No. 1218.

This contract, dated January 2, 1940, is for 105 milling machines and equipment at an aggregate sales price of $675,735, and it merely regularized orders which had theretofore been placed by the French Stokvis Company with the defendant, as follows: On October 22, 1939, the French Stokvis Company confirmed prior orders for the machines, advising that payment would be made by the French Mission in New York. On November 3, 1939, the defendant advised that the orders had been entered at prices current 120 days before the scheduled shipping dates, including a 15% discount reserved for the French Stokvis Company. On November 4, 1939, the French Stokvis Company wrote the defendant, giving the prices quoted to the French Government, and the commissions payable thereon, amounting in the aggregate to $675,735. The contract was entered into at New York between the French Government and the defendant at the prices specified in the letter of the French Stokvis Company of November 4, 1939.

### Contract No. 483.

This contract, dated March 6, 1940, is for 12 milling machines and equipment at an aggregate sales price of $52,848, and it also regularized earlier orders placed by the French Stokvis Company with the defendant. On November 4, 1939, the French Stokvis Company confirmed by letter prior cable orders for these machines destined for Gnome & Rhone. and advised that the orders would be confirmed by the French Ministry headed by Mr. Maillet at the prices shown on an attached schedule, together with specified commissions for the French Stokvis Company. The contract was executed at New York with the French Government, and contained the following provision:

"The prices quoted herein by the seller include a commission of 15% for the foreign dealer, R. S. Stokvis."

### Contract No. 1365.

This is another regularizing contract, dated March 6, 1940, and covers 12 milling machines and equipment at an aggregate sales price of $81,552.00. On November 7, 1939, the French Stokvis Company confirmed prior cable orders for these machines, destined for d'Armes de St. Etienne, to be passed by the French Mission in New York. This was followed on November 24, 1939, by further advice to the defendant stating the prices quoted and the commissions thereon for the French Stokvis Company. The contract was executed at New York by the French Government at the prices specified, and contained the same provision with respect to commissions as contract No. 483.

### Contracts Nos. 240 and 240-A.

Contract No. 240 dated as of December 12, 1939, is for 1415 milling machines at an aggregate sales price of $12,165,993.

Contract No. 240–A, dated as of the same date, is for equipment for the machines covered by contract No. 240, at an aggregate sales price of $1,215,268.

In the middle of October 1939, a French Purchasing Commission headed by Captain Maillet came to the United States to make purchases of machinery for the French Government, including between 1700 and 2000 milling machines which were urgently needed for the French war effort. The Commission proceeded at once to canvass the American tool manufacturers in an attempt to place orders for these milling machines, and found that all the manufacturers were so flooded with pending business that they were reluctant to accept new orders of the magnitude offered by the Commission. The defendant was at the time operating on orders which required the full capacity of its existing plant equipment until 1941, but it was interested in meeting the requirements of the Commission, provided that satisfactory arrangements could be made materially to add to its plant equipment and to finance the operations as they proceeded. This interest of the defendant is shown by the fact that on October 27th it cabled the French Stokvis Company that it had an inquiry from Maillet for 1281 machines, and asked whether it could offer the machines which the French Stokvis Company then had on order. The French Stokvis Company cabled in reply refusing permission to offer these machines, but stated: "You may offer other machines but only based on list prices."

The negotiations between the Commission and the defendant commenced actively on November 8, 1939, and continued with little interruption until contract No. 240 was signed on December 12, 1939. The Commission was generally represented during the negotiations by Captain Maillet and Messrs. Glowinsky and Revol, and Messrs. Trecker, Burk and Carpenter of the defendant participated at various times in the discussions. The defendant took the position at the outset that in order to undertake the work it would be necessary to erect a new plant, install new equipment and hire a considerable number of additional employees, and the Commission agreed that this additional expense should be figured in the prices of the machines. At first the Commission asked for deliveries within 22 months, but later insisted that the time be shortened to 12 months.

This change materially added to the cost of the machines. The result of the negotiations was that the Commission agreed on prices for the machines and equipment, which included the estimated cost of the new plant, new equipment and speeding up of the work.

During the discussions with the Commission the question of commissions was brought up at various times, and it is the undisputed testimony of the witnesses who testified on the subject not only that the Commission insisted that the prices for the machines contain no allowance for commissions, but that the prices as finally written into the contracts in fact made no such allowance. Burk testified that at the first meeting with the Commission on November 8th the members stated that "they came to this country to deal directly with the manufacturer, and that no dealer was to be involved," and, further, that "they came to this country to work with the manufacturer and determine exactly what could be secured from the manufacturer and that in no way was there to be an allowance made in our prices for dealers' commissions or discounts or fees."

Trecker testified that at one of the early meetings with Captain Maillet and Glowinsky, "They said they would not countenance dealers." Carpenter testified that at a meeting with the Commission on November 23rd, they were asked whether the figures submitted "included any allowance for Stokvis, and we said no, they didn't include any allowance for Stokvis." Revol, a member of the Commission, testified that at one of the meetings with representatives of the defendant "Captain Maillet made the statement that the price of the machines would not include any commission for the dealers in France."

In the meantime, Goldschmit, representing the Stokvis European interests, had arrived in the United States to straighten out some difficulties with respect to Stokvis orders. On November 18, 1939, the French Stokvis Company cabled the defendant that the "French Government decided yesterday to give full confidence your agent recognizing the principle of our usual agents discounts and have cabled new instructions to French Missions." This was followed on November 20, by a letter from the French Stokvis Company to the defendant stating that "the period of misunderstanding seems to be entirely closed as the Government have cabled to the Mis-

sions in the States not to interfere with the question of our commission." On November 23rd or 24th, Messrs. Burk and Carpenter of the defendant company had a meeting with Goldschmit at the office of the New York Stokvis Company in New York, at which Goldschmit asked about the negotiations with the French Purchasing Commission, and was told how the negotiations were progressing. A further talk was had with Goldschmit on December 7, at which servicing of the machines after they had arrived in France was discussed, and Goldschmit was told that the French Stokvis Company would be compensated for such services with a service fee of 2 or 3%. This information was communicated to the French Stokvis Company by Goldschmit, and the cable reply from Paris was that the French Stokvis Company "expect our full ten per cent commission and by no means less," and, further, that "we shall never be satisfied with tips as suggested to Goldschmit." This cable was received by the defendant on December 9th.

Contract No. 240 was signed at New York on December 12, 1939, and provided for payment by the French Government of 50% of the total purchase price, or $6,082,996.50, upon the signing of the agreement, which sum was to be deposited with the First National Bank of Chicago as escrow agent under an escrow agreement providing for the withdrawal of the funds by the defendant as the work progressed. The contract had attached a schedule specifying unit prices for the various types of machines purchased, and these prices were approximately 38% above the defendant's list prices. The machines were standard machines, and the overage was to take care of the cost of the additional plant and equipment and the additional expense resulting from the speeding up of the work. The contract contained the following warranty and representation by the defendant:

"The seller has not employed any person to solicit or secure this agreement, or the sale hereby agreed to, under any understanding or arrangement for the payment to such person of any commission, percentage, brokerage or contingent fee."

The escrow agreement with the First National Bank of Chicago, provided for in the contract, was executed on December 16, 1939, and acknowledged the receipt by the escrow agent of $6,082,996.50.

Contract No. 240–A covering the equipment for the machines, although dated as of December 12, 1939, was not actually executed until February 28, 1940, and closely followed the language of contract No. 240. It similarly provided for an advance payment to the escrow agent of 50% of the total purchase price, and it had attached a schedule of the unit prices of the various articles of equipment. The escrow agreement with the First National Bank of Chicago provided for in the contract was executed on February 28, 1940, and acknowledged the receipt by the escrow agent of $608,693.10.

The German Army invaded France in May, 1940, and the French capitulated on June 17, 1940. On June 16, 1940, The French State made a blanket assignment of all outstanding French contracts in the United States to the British Government. The defendant at first refused to recognize this assignment, due largely to its fear that the defendant's rights in the escrow funds would be jeopardized, but after protracted negotiations with the British Purchasing Commission an agreement was reached on January 17, 1941, under which the British Government was recognized as the assignee of the contracts and assumed all obligations and liabilities thereunder. In this agreement, some changes were made in contracts Nos. 240 and 240–A, and there was a provision that the British Government would indemnify the defendant for "any sums for which you may possibly become liable to any of your agents because of machines which may have been or may be delivered by us elsewhere than in France."

At the time of the assignment from the French State to the British Government on June 16, 1940, the defendant had delivered to the French Government 7 of the 12 machines covered by contract No. 483, and these machines had been fully paid for and had found their way into France. There were also 86 machines covered by contract No. 240 which had been invoiced to the French in this country prior to the assignment, but they had not left the United States. Except for the 7 machines mentioned above, all other machines and equipment covered by the contracts were delivered to and paid for by the British Government, and none went into French territory.

Hugo Stokvis, the president of the Dutch Stokvis Company and the Adminis-

trateur Delegue of the French Stokvis Company arrived in the United States in September 1940, and brought with him a copy of the organizational papers of the French Stokvis Company and copies of certain minutes of meetings of the board of directors of the company. These documents were all identified by Mr. Stokvis, and showed that he had all of the powers of the board of directors of the French Stokvis Company and complete control over its affairs.

On September 27, 1940, Mr. Stokvis, acting as "managing director and attorney in fact" for the French Stokvis Company, executed in New York an assignment from the French Stokvis Company to the New York Stokvis Company of all claims of the French Stokvis Company against American manufacturers. Contemporaneously with the execution of this assignment, the New York Stokvis Company entered into an agreement with the French Stokvis Company, under which the New York Stokvis Company undertook to make diligent effort to effect collection (1) of deposits or advances made to American corporations, and (2) of commissions, discounts and the like. The agreement provided with respect to the first group of claims that the monies would be held for the account of the French Stokvis Company, and with respect to the second group that they would belong to the New York Stokvis Company. The assignment to the New York Stokvis Company was subsequently ratified by the Dutch Stokvis Company at a meeting of the board of directors held in New York on September 19, 1941, and it has been licensed by the Treasury Department under Executive Order No. 8389 as amended, 12 U.S.C.A. § 95a note, and the Regulations and Rulings issued thereunder.

■ 1. The defendant first challenges the assignment of September 27, 1940, made by the French Stokvis Company to the New York Stokvis Company, on two grounds, namely, (1) that it was invalid under French law, and (2) that it violated Sections 275 and 280 of the New York Penal Law, Consol.Laws N.Y. c. 40. With respect to the first contention, it is clear that Hugo Stokvis had adequate powers as Administrateur Delegue of the French Stokvis Company to execute the assignment, and it is not in the mouth of the defendant to question the adequacy of the consideration. See Hoppe v. Russo-Asiatic Bank, 200 App.Div. 460, 193 N.Y.S.

250. I find nothing, either, in the French foreign exchange decree of April 30, 1940, to prevent such an assignment; this decree, even if enforceable in this country (which may well be doubted), by its terms excepted such an assignment as the one involved in the present case. I think, therefore, that the first contention is untenable. The second contention with respect to Sections 275 and 280 of the New York Penal Law is also without merit. These sections prohibit the assignment from one corporation to another of claims "with the intent and for the purpose of bringing an action or proceeding thereon" (Section 275), and have been construed broadly by the New York courts. Bennett ex rel. New York County Lawyers' Ass'n v. Supreme Enforcement Corporation, 250 App.Div. 265, 293 N.Y.S. 870, affirmed 275 N.Y. 502, 11 N.E.2d 315; Zindle, Inc., v. Friedman's Express, Inc., 258 App.Div. 636, 17 N.Y.S. 2d 594; Gellens v. 11 West 42d Street, Inc., 259 App.Div. 435, 19 N.Y.S.2d 525. These cases, however, have no application to the facts of the present case, where the purpose was to preserve assets in this country belonging to the French Stokvis Company, and the assignment to the New York Stokvis Company was absolute and not "with the intent and for the purpose of bringing an action or proceeding thereon." See Commission for Polish Relief v. Banca Nationala, 176 Misc. 1064, 27 N.Y. S.2d 377.

■ 2. The defendant next insists that the action cannot be maintained because the 1923 exclusive sales representation agreement was neither made with the French Stokvis Company nor was it an enforceable contract against the defendant. The French Stokvis Company was incorporated in France in 1914, and it had during the succeeding period prior to 1919 dealt in the defendant's products in France. After January 1, 1924, when the 1923 agreement went into effect, the French Stokvis Company acted as the defendant's exclusive dealer in France, and the defendant's price list summaries for 1939, 1940 and 1941 in evidence show that the company was listed as the defendant's foreign dealer for French territory. Moreover, the French Stokvis Company was at all times a wholly owned subsidiary of the Dutch Stokvis Company, and was treated by the defendant as a separate entity in the Stokvis group of companies. I do not doubt, therefore, that the 1923 agreement

was made for the benefit of the French Stokvis Company with respect to French territory, and constituted an agreement with that company.

■ The question of the enforceability of the agreement is more troublesome, due to the fact that it contains no provisions with respect to quantities, prices, deliveries, payments, or even discounts. According to the agreement, these provisions are all left "to be arranged separately." There is, however, a grant by the defendant of "exclusive representation" in Holland, Belgium and France, "for an indefinite time," subject to termination on six months written notice. The Dutch Stokvis Company on its part agrees to push the sales of the defendant's products in the territories granted to the best of its ability, "exclusive of any other American make." There is also a provision that the defendant will refer "all inquiries or orders coming from or destined for the territories mentioned." I think this constituted a valid agreement insofar as exclusive representation was concerned; it did not lack definiteness or mutuality in that respect. Schnerb v. Caterpillar Tractor Co., 2 Cir., 43 F.2d 920. It is true that in the Schnerb case the agreement specified the prices at which the tractors would be sold, but it was vague and indefinite in other respects; yet the court held that there was a valid contract as to exclusive representation. Such cases as Jordan v. Buick Motor Co., 7 Cir., 75 F.2d 447, Huffman v. Paige-Detroit Motor Car Co., 8 Cir., 262 F. 116, and Plant Manufacturing Corp. v. Renner, 214 App.Div. 606, 212 N.Y.S. 710, affirmed 243 N.Y. 557, 154 N.E. 604, cited by the defendant, are not in point because they do not concern sales in violation of an exclusive representation agreement.

■ 3. This brings me to the first cause of action relating to the sales of 129 milling machines and equipment covered by contracts Nos. 1218, 483 and 1365. The orders for these machines were fully negotiated by the French Stokvis Company and accepted by the defendant before the Maillet Commission came to the United States, and the correspondence shows that the defendant agreed to pay the French Stokvis Company a commission of 15% thereon. The formal contracts with the French Government which followed were merely to put into definitive form the orders previously closed. It thus appears that the plaintiffs' claim on the first cause of action rests entirely on the defendant's express promise to pay the commissions, and not on the 1923 exclusive representation agreement. The defendant recognizes its original obligation to pay commissions on the orders, but insists that with respect to all but 7 of the machines, the commission should be reduced to 7½%, due to an established custom in the trade to the effect that where machines are diverted to a territory outside of that of the original dealer, the original dealer is entitled only to one-half of the commission. The existence of this custom was proved at the trial, and it was justified by the different witnesses on the ground that the dealer into whose territory the machines were delivered was necessarily put to considerable expense in setting up and servicing the machines after they were received. I think, therefore, that the plaintiffs are entitled to recover on the first cause of action the full 15% on the sales price of the 7 machines delivered to France, and 7½% on the sales price of the 122 machines delivered to the British Government and shipped to territory outside of France. The defendant concedes that its liability on the basis of these percentages is $62,882.68.

■ 4. The second cause of action, involving the 1415 milling machines and equipment covered by contracts Nos. 240 and 240–A, is framed on the theory that the defendant agreed to pay the French Stokvis Company 10% of the total sales price under both contracts. The sole basis for the contention is to be found in the cable from the French Stokvis Company received by the defendant on December 9, 1939, or three days before contract No. 240 was signed, stating "expect our full ten per cent commission and by no means less." It is argued from this that by subsequently entering into the contracts, the defendant impliedly agreed to pay the 10% commission demanded by the French Stokvis Company. The fallacy in the argument is that at all times during the negotiations leading up to the contracts, the defendant took the position, at the insistence of the Maillet Commission, that no commissions would be allowed to the French dealer, and the evidence shows that the French Stokvis Company was fully advised of that fact. I can see no basis, therefore, for any contention that the defendant impliedly, or otherwise, agreed to the demand for a 10% commission.

268

5. The question remains whether there can be any recovery for damages under the third cause of action for the sales covered by contracts Nos. 240 and 240–A. It is to be remembered in this connection that the 1923 exclusive sales representation agreement contemplated only a dealer arrangement with the French Stokvis Company, under which the French Stokvis Company was to purchase machines outright from the defendant and make its profit on resales to its own customers. That is the way the operations were conducted by the French Stokvis Company over the years, and the defendant had at all times full control over prices, deliveries and discounts. In order to recover damages, therefore, it is necessary for the plaintiffs to show (1) that the French Stokvis Company could have made the sales covered by contracts Nos. 240 and 240–A, and (2) the profits that the French Stokvis Company would have realized had it made the sales. Carlson v. Stone-Ordean-Wells Co., 40 Mont. 434, 107 P. 419, 422; Carr v. Hills Archimedean Lawn Mower Co., 12 Daly, N.Y., 332; Curtiss Candy Co. v. Silberman, 6 Cir., 45 F.2d 451. The evidence is completely lacking in either of these two respects. In the first place, it is inconceivable that the French Stokvis Company could have purchased from the defendant the machines and equipment called for by contracts Nos. 240 and 240–A under the terms of those contracts. It is also doubtful whether contracts of that magnitude and character were ever in the contemplation of the parties in making the 1923 exclusive sales representation agreement. Contracts Nos. 240 and 240–A were not mere ordinary agreements for the sale of manufactured products; they involved large expenditures for the erection of a new plant, for the acquisition of new equipment, and for the unusual speeding up of the work; and they required extraordinary cash advances to finance the operations as they progressed. In the second place, it is perfectly clear that the French Stokvis Company could not have resold the machines and equipment at a profit in French territory, even if by any stretch of the imagination it could be assumed that it would have made the purchases from the defendant; for the only possible purchaser at the time was the French Government, and the French Government was definitely committed against the payment of any profit by way of discounts or otherwise to the French Stokvis Company. I do not think, therefore, that there can be any recovery for damages under the third cause of action.

There may be a judgment for the plaintiffs on the first cause of action for $62,882.88, with interest on the various sums making up that amount from the respective dates of the applicable contracts; for the defendant on the second and third causes of action; and for costs to the plaintiffs.